Good afternoon. This is case number 26-1348, City of Philadelphia, against the Secretary, U.S. Department of Interior, et al. Mr. Enderbergen? Good afternoon, Your Honor. Mr. Enderbergen, on behalf of the United States, I'd like to reserve eight minutes of my time for rebuttal. Granted. Mr. Enderbergen, on behalf of the U.S. Department of Interior, I'd like to reserve But yes, the discretion itself remains the same. And I think the reason that makes sense is if the site had been designated before any exhibit had been created in 2006, based on archaeological or historical evidence that there had been slaves at the President's House and the Underground Railroad had a connection, that would have been acceptable too without any sort of President's House exhibit, meaning the designation is based on the connection to the Underground Railroad. Not interpretive exhibits thereon. On top of that, the designation remains. Changing the signs, taking them down, has not in any way altered the designation. The Secretary still has the site designated. The site will remain designated. That hasn't changed. And I think it's important to remember that the hypothetical Your Honor posed about removing all reference is not this case. So let me bring it back. Earlier, in response to one of Judge Hardeman's questions, you said that's not what's planned. What is planned? I think at this point, given that the Park Service has posted on its website their intended replacement signs, those are the ones they intend to install once they're able to do so and are not subject to an order that prevents them from doing so. I was discussing agency discretion by law. On top of that, even if we get past the discretionary piece, the city failed to establish a substantial likelihood of success on the merits. They requested and obtained a mandatory preliminary injunction, which this court has instructed has a particularly high bar. They need to establish that they have a substantial likelihood of success and that their right to release is indisputably clear. They have not. Their statutory claim, the principal statutory claim they bring, is predicated on 16 U.S.C. 407N. As we explained in our briefing, both the district court and the city have misinterpreted that provision. You're reading that specifically to the historic site, correct? Correct. And it's your understanding the city and the district court expanded that to include the entire park? Yes, the district court opinion by its explicit terms expands that term to cover the whole park. And the city in its briefing has defended it on that basis. Their only statutory defense of 407N specifically embraces the notion that the site was merged, absorbed into the park over time, and with it their right to veto any alterations likewise expanded. They take no authority for that notion. It also is inconsistent with the plain meaning of the statute and fundamental principles of statutory interpretation. There is no reason also, no logical, sensible reason that Congress, when it drafted this statute, would have intended for the city over time to gain more expansive authority over federal property. It made sense for it to specify and protect the city's own property. As long as the site was city property, specifying that that must remain the actual property of the city and that no alterations can be made to that property made sense. When you say city property, you're talking about Independence Hall itself and the adjoining buildings. Precisely. And Carpenter's Hall. Not city property, but the Carpenter's Union or organization owned it. Exactly. So 407N, read naturally, authorizes two types of cooperative agreements with two types, two non-federal entities. One with the city to govern the site, one with the Carpenter's Company in Philadelphia to govern Carpenter's Company. And it's your position that the mutual consent requirement applies with respect to those specific properties. By the term... Carpenters have a right, they have a say in what happens at Carpenter's Hall and the city has a say in what happens at Independence Hall and the adjoining buildings. Exactly. And the reason we know that is because Congress wrote that in the statute. It says the cooperative agreements are with those two entities and those agreements shall specify that no alterations or changes shall be made to those properties. The 1950 Act's a little fuzzier than that, though. The 1950 Act seems to express some forward-looking intent that the park would expand over time and that the federal government and the city of Philadelphia would act cooperatively as that park expanded. Isn't that right? I think I would agree on the first part, not necessarily on the second part. I think the Act, without question, explicitly contemplates future growth of the park over time. It authorizes the Secretary to acquire additional properties and to determine, essentially, what the scope of the park shall be. But there's no indication, no explicit statutes for indication, that Congress expected the city's right over the park to also somehow expand. I think that's exactly why the 1950 Agreement reads the way it does. It essentially delineates the specific obligations and rights of both parties. It has the known alterations to the property with an independent square language, but also has a sort of purpose provision that governs the party's intent and their pledge long-term. Let me ask you this language I'm reading from Section E. It is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation for the whole Independence National Park, and for the inspiration and benefit of the people of the United States, and to secure this result to a high degree of cooperation. Wouldn't that suggest that the government's understanding was that this expanded the agreement to the entire park? I think the fact that that's separate from the actual specific language that gives them an actual right to approve before any alterations are made actually contradicts that. You know, Judge Restrepo is reading that passage, but if you keep reading down the passage, it ends with, quote, And the parties here, too, pledge to consult themselves on all matters of importance to the program, quote. So do you think that program is, you've got a pledge of consultation, not with respect to a site or to a park, but to a program? Isn't program of those three choices, site, park, and program, the most general? I think if you look at the first sentence of that provision, which reads that it is the purpose of both parties to this agreement to develop a unified, long-range program of preservation, development, protection, and interpretation, that the program in the last sentence refers back to that program, and I think it doesn't expand the actual term of the site or the right of mutual agreement. I think it expresses a general intent, and it makes sense because Independent National Historical Park sits in the city of Philadelphia. It makes sense that the parties hope to proceed cooperatively and intend to for the long range. That is historically how the relationship has been. And if they don't, do you think that the city would have standing to challenge that? None. There is no enforcement provision in here. There's no actual right to veto. There's no more expansive obligation. It essentially expresses- Isn't that a merits-based answer? If there is no pledge, if the consultation, if the pledge consultation doesn't take place, why isn't that a cognizable injury in fact, like it would be for many other contracts? I think that's answered by the Supreme Court's procedural right jurisprudence. So we discussed this in our brief, and what they've held is that- I think I know what you're going to say. I think you're going to cite to Summers v. Earth Island and then the recent Brown Heroes Act case. I don't want to step on your toes or read your mind, but that's what you said in your brief. But both of those are procedural rights tied to statutes, not procedural rights that derive from contract. Doesn't that matter? I don't think so. If you have an absent enforceability provision, if you contract with someone and have specific terms, and in the course of drafting that contract, you also express a procedural pledge to consult. And rather than allege a violation of a specific obligation or burden, the contracting party sues for a violation of that right. It's hard to see what their injury is. Is there any case law to that effect in the procedural rights space? I thought it was all statutory procedural rights, not contractual procedural rights. I think although the cases we cited deal with procedural rights based on statute, I think the principle transfers because the very notion of an injury in fact hinges on a concrete, particularized, substantive- So does a person for a breach of contract action in federal court have to show an injury in fact, or with breaches of contract actions already recognized as cases or controversies at the founding such that no injury in fact is needed for such a claim? I think you still need an injury in fact. I think there's no case that I know of that essentially says for breaches of contract claims, a de facto breach without any cognizable harm is in and of itself sufficient. I think we analyze breaches of contract claims under the ordinary principles of Article 3 standing, which require injury in fact. And I think a mere procedural violation of a mere alleged violation of a procedural pledge without some sort of concrete underlying substantive interest that's affected by the violation does not result in an injury in fact. It's unenforceable. And I think that makes sense if you look at this contract. There are specific provisions that undertake obligations and that bind the parties in which they commit to do particular things and give each other rights. This is a praise, purgatory type of provision that essentially expresses a general intent without any enforceable piece. On top of that, even if this court were to hold otherwise, and this case were to be resolved on that basis, all that would have to happen is for the park service to inform the city of its intentions. And then it has consulted, it would be meaningless. There's no point. To this provision, because it doesn't actually give the city the right to veto anything or to prevent anything. I don't want to double back to the previous point, but at various points in time, you say this case is barred under the Tucker Act. We can't hear the case in this form because it's the Tucker Act, but you just kind of said they could never pursue this. There would be no standing, no Article 3 standing anywhere. So, so isn't the Tucker Act kind of point that you're making a little bit illusory if when they showed up in the court of federal claims, you said, nope, sorry, no standing here either. No, I think now, and the reason for that is these are alternative separate arguments. So, the city city's argument of a violation of the 1950 agreement and for seven and is more expansive than just predicated on the procedural pledge. They posit that the agreement and the statute apply to the whole park. It's more expansive. It doesn't hinge on the procedural pledge violation. Now, putting that argument aside. They also seem to suggest and argue that there is an independent violation of this procedural pledge, which would survive. Even if the site is interpreted to be just independent square, because the pledge applies to the whole park, as opposed to just the site. So, the fact that the procedural pledge by itself may not be enforceable, or may not provide injury doesn't mean that their view of the law, the broader first line argument, or argument that there is a breach of this agreement isn't cognizable by the court of federal claims. I think moving on. The, so that's the Tucker act piece. I think separately, they rely on various agency documents. We can, we can hear you on rebuttal on that. Let's I think it would be useful to hear what the city has to say about that. We understand your argument that this is a cognizable into the. I think that leaves the ultra virus claim. That one fails both because it's subject to the Tucker. That's just a derivative claim. Is that how you see that? I do. And I do think, given that there's no specific statutory prohibition, which is Supreme President, the fight is required that hard to act ultra various of something that doesn't order you to do anything. Exactly. Your honor, that's that's likely to success that leaves your harm. As we've argued, the harms identified to the district court are to indeterminate and not legally cognizable forms of irreparable harm on top of that. The actual exhibits could be restored and reinstalled or entirely replaced if need be at a cost of twenty thousand dollars and approximately three weeks. There's no actual irreparable emergent harm that required this. On top of that, there's the over breath and the mandatory nature of the injunction. It wasn't tailored to the nature of the violations found numerous provisions, including the continuing maintenance obligation. The snow sweeping provision and the TV operational provision have nothing to do with the claims that were alleged, which had to do with the actual removal of the exhibits. That's not even an remedy on top of that. That's specific performance, which brings us back to the Tucker is the lead time for the exhibits that you want to display three weeks. Also, or is it a different lead time? I believe at this point that the new exhibits have been manufactured, but I think the installation may take more time, but I'm not entirely clear on that. At the same time, given what we know about the original exhibits, and given that they would essentially take up the same amount of space on the same spots, I would assume that three weeks and the same cost is reasonable to infer. I reserve the remainder of my time for rebuttal. Thank you. Taylor. Good afternoon and Taylor for the city of Philadelphia. Your honors with your permission. I'd like to start with the question that the court directed to the parties on Sunday evening. Notably, what is this in terms of an agency action? So. 55113 describes agency action as the whole or part of an agency rule order license sanction relief or equivalent thereof. And as this court has recognized in the Gentile case from around 2020, this list is exemplary, not exhausted. But specifically 55110D describes sanction in part as a destruction of property. And so here the property is President's House and the destruction is the removal of all the panels that give the President's House meaning. So where we stand, and I do want to emphasize for purposes of this record, there is nothing in the record that anything other than removal was contemplated by the federal government when this happened. Some of that is because this was fast moving, but also because at the preliminary injunction hearing, the government did not put on any evidence of an alternative. So, what the court is dealing with on this record is the President's House as it existed on January 21st. And the President's House with no panel. So, what do we make this Taylor of the government's representations today? That the replacement panels are up on the website. So, your honor respectfully, those can certainly be considered by the district court in assessing to the extent those were contemplated or design and works before the agency action here of removal. Those might be part of a more fulsome record that the court would consider in considering whether the federal government appropriately. Thought of the various factors and the overlays that are applicable to this site. And so that may be appropriate for the district court on remand, but for purposes of this court, they're not in the record here today. So, talking, then we need to focus on whether the federal government had the power to take down the displays. That's correct. Your honor. And it really is that discrete question. All right. And let's start with what I think we might agree on. And if we can't then correct me. The President's property is not and was not owned by the city. Correct? That is correct. Okay. And the city does own Independence Hall and the adjacent buildings. Correct? That's correct. Okay. Would you agree that the distinction that the federal government is trying to make here to try to separate or distinguish the five acre parcel of independent square from the fifty five acre parcel of Independence Park is a meaningful distinction. I think certainly for purposes of some of our claims that that can be, I think. All right. And the district court agreed with you that that the city's rights weren't just inherent in the five acre parcel, but in the larger fifty five acre parcel. That seemed to be a key pillar of the district court's decision. Was it not? So the district court's decision looked at that and considered where Congress had passed the nineteen forty eight act identifying that Independence National Park. Hall National Independence Hall National Historical site was owned by the city of Philadelphia and that that was specifically different from Independence National Historical Park, which Congress created in nineteen forty eight, and directed the use of cooperative agreements for the federal government to engage with the city. Two years later, the cooperative agreement issued by which the federal government, in fact, committed to an enhanced working with collaboration with the city for the program for the whole of the park. Now, interestingly, with that Congress that Congress wasn't done with Independence National Historical Park at that point in time, it revisited the scope of the park in several enactments in the late fifties. In the sixties in the, and then, I believe, in nineteen ninety six was the last time Congress examined and touched on what is Independence National Historical Park? What is the scope of the park ahead of any of those Congress? Presumably would have been aware of the nineteen fifty cooperation agreement and the enhanced scope that the secretary committed in terms of engagement on the park itself, particularly because the nineteen fifty agreement is only capable of revision by an active Congress. So, it is a different type of vehicle to reduce the collaboration between the federal government concedes that the nineteen fifty act remains in effect. Indeed, but then we get to two thousand six and the run up to this particular site and the three amendments that followed and the city clearly had contractual rights in those cooperative agreements. Correct? Well, and I think if I might your honor, yes, and so those agreements also really frame out what the president's house is and particularly why the city has residual interest in the existence of the house. All right, well, that's that's what I want you. You're ahead of me. So, in a good way. As I read these agreements, the city has clear contractual rights. If, for example, the party that was selected to do the exhibits, the federal government vetoed it, then the city could have gone to court. If the excavation wasn't being done, according to the agreement, the city could have gone to court. There were a lot of times the city could go to court while the president's house was being established. You use the word residual and I think that's important for us to understand what tail rights or what ongoing rights, if any, the city has, because what you're running up against is some language that says, once the site is established, the president's house is established. The city donates the property to the National Park Service and the National Park Service then retains the obligation and the duty to maintain interpret, etc. Correct. And yes, and all of that, even even stepping before your honor, what I would suggest, or say that the record reflects is that all of the work that the city did and the public taxpayer dollars that the city spent was to create. And this language is throughout the record, a permanent outdoor installation. So that is what the president's house is. That is what the city built worked collaboratively to design. And where's that language permanent outdoor installation. So you can see that and that's in the record through all of the joint press releases that the city and the National Park Service issue together. You're not going to get a contractually enforced right from a press release. So what what contractual document says that you have a permanent out outdoor installation is not in the contractual documents that I recall standing here. It is however described and when I say the city has a residual interest in the existence of president's house. That is because that is why the city spent taxpayer dollars to build it, and then donated it with. And I think that it's fair to say the contractual documents all demonstrate a stewardship expectation of the federal government, as it took on the maintenance care of this site. So the structure still there correct. The structure of the walls with the names of the folks that are engraved and the footprints are there. Correct. Is it the city's position that the government can't curate its property. That is correct Your Honor because this is not an active curation and again that is why I emphasize that everybody understood this to be a permanent installation as it was designed planned and installed. So that is specific to the site that sounds like once they put up the exhibit it had to stay that way forever. And Your Honor so that your position that standing here, what I would say change any changes to that any potential changes could be and should be done consistent with the overlay of the foundation document. Before we get to the foundation document. Do you have enforceable rights that the exhibit needs to stay as it was first installed forever in the future. So Your Honor with that I would say the third attachment to the 2009 cooperative agreement is the overlay of what the site is about what is it is expected to have in it. And any interpretation is supposed to be consistent with. So, within that, and with the interpretive guidelines it provides, there's a reasonable expectation of ongoing existence of the exhibit. And then the activity around the margins of it would be consistent with that project plan. I guess I understand why the city would expect that when the president's house was erected with the exhibits, and the, the talent that was procured and paid for to do the exhibits, including the videos. I understand why the city would have an expectation that that would stay the same for a while. I'm having trouble understanding why the city would have a reasonable expectation it would always stay that way. Let me give you an example. What if history is changing we learn new things what if we learned that there were in fact 12 slaves there instead of nine. Is it the city's position that it would have been illegal for the National Park Service to do new panels new exhibits and add three names to the wall. So, your honor, what I would say is it's the city's position that any such change and of course history does develop, but any such change would be considered and appropriately considered by the park service consistent with the overlay on its own discretion for changes to this, that it put in place through the foundation document. So, can I just get in, you know, this, this, this 3rd amendment, the cooperative agreement has a paragraph and article 3B paragraph 17, it's on 315, and it says, quote, consistent with the partners intent to donate the project to the NPS is stated herein any claim or right to any property interest, including use rights or to compensation for any project components donated to NTF on behalf of the partner. And that was something that I understood was part of the city's agreement, because article 3B is what the city agrees to what doesn't that kind of was asking earlier about, you know, we've got residual and we've got tail. Once, once the donation happens, isn't the city out of luck. So, your honor, I would suggest that use does not contemplate the lack of existence. So, at this point, what we have with the president's house is without the panels, the president's house has donated no longer. But, but, you know, use was just 1 of the things that said, it said, including use rights, it says, waive any claim or right to any property interest. Like, you do you think you have any property the city has any property interest in in the president's house or exhibits or otherwise. So, your honor, what I would say, instead of a property interest, the city has a residual interest in the existence. Right? So, in terms of a contract interest, not a property. Right? Well, and also, it's a more I'm asking. Oh, yes. Um, I think that is more more it is explained at least in the contracting documents and where I would put it's residual of what it doesn't have to be residual of the property that the city previously owned. You call it a residual interest, but I guess my question is residual. What? It's not residual of the contract because the contract is what you just did. You're saying it's it has to be residual of the prior property interest. Right? The city never had a property interest. Correct. So the, I think the state, I thought your argument, if I'm not helping you then correct me, but I'm trying to help you here. I thought your argument was that the city had a contract based expectation. That what happened in January of this year would not happen. I think there is a contract based expectation illustrated by the contract documents that give the city grounds much like in an environmental case where there's non pecuniary non property based interest can be sufficient for article 3 standing to state and administrative procedure act, arbitrary and capricious claim about agency action. That is more akin to the contracts describe the city's reasonable expectation in the existence of this property. The city's claims are about how the federal government pursued its actions at this property. What do you make of the 2006 agreement, Ms. Taylor? The language specifically on ownership of the exhibit. I'm sure you're familiar with it. Where it reads upon completion of the exhibit in accordance with this agreement, ownership of the exhibition transferred to NPS. So, did the city give it away? So, your honor, what the city did there was transfer the intellectual property rights and there's testimony in the record about the understanding was that NPS needed those property rights so that it could monetize the site. So, create sellable items about the intellectual property at the site to then help support maintenance of the site. What do we do with that language? So, again, with that language, I think much like I just said, it shows, yes, the city transfer this with an expectation of stewardship, but throughout it, the residual property, right? Is the expectation of existence and that falls in that zone 3 or sorry, article 3 cognizable interest of a non property non pecuniary. Aspect in which the city can then contend that the way the federal government went through and did or did not deliberate did not comport with requirements that it ought to have done. So, at the end of the day, the city's position is that any decision the government makes with respect to curate exhibits. Has to see has a sign off the city. No, but the city's position here, and this is specific to our claims that are articulated under the, with respect to the foundation document network to freedom. And also for 7, is that the federal government has to duly consider what cabins its discretion in those spaces. So, for example, in the foundation document, the organic act gives the secretary directs the secretary that. Excuse me, let me find the exact language. Sorry, so the organic acts directs that the secretary needs to take action and run the parks consistent with the statutory purposes of the park and with the system, the purposes of the system units. So, within this particular system unit. The federal government, particularly the park service laid out what the purpose of the system unit is in its foundation document. And so what the court can do is evaluate whether. Based on an administrative record again here, there's none. What, whether, and to what extent the park service considered and appropriately considered the foundational resources and values that the park service itself applied to this park system unit. And so, whether the park service before taking the action of removal, consider that collaboration and partnership is a foundational resource and value for this part, whether they consider that the archeological resource of the remains of the footprint of the house. Before taking all information about those remains out, if they consider considered that and making their decision, but so the, the cities. Can make those claims and have standing to make those claims. Is count 1 still in play in terms of count 1, your honor that is the city's cooperation agreements and I think where that comes into play and the argument the city made there in briefing to the court. And as the United States acknowledged, it's a argument made in the record. So we are here before the court on that as an alternate basis. The cooperation agreements here are wholly different in kind than the types of contracts that are barred from consideration by the Tucker act. So, I would highlight for the court that there's no exchange of really any money in these. There's nothing that suggests these are procurement like contracts and further that these are. Contracts that just reduce a course of conduct between the 2 of them to writing. So, it is not something that is itself even cognizable in the court of federal claims, because there is no monetary relief. And respectfully that the United States and judge Hardiman, you were saying earlier all the times we could have gone to court on the 2006, the court specifically contemplated by the parties in there was the eastern district of Pennsylvania. Well, that could well be true, but that doesn't mean that the parties could agree to violate federal law. Federal law says it has to go to court of claims and ask. And I would more suggest that it shows the parties understanding that this was something other than a contract controlled by the correct. 1 other thing on the foundation document is that part of the National Park services management policies. So that is, I believe, in addition to the management policies. So, the management policies dictates sort of overarching behavior within the park service and then the foundation document really gives granular insight into how the park service considers this park in particular. So, independence, national, historical park, and if I could just briefly on 1 point that came up in the briefing that I did want to touch on is the city is not saying the federal government has to has to comply. With the foundation document, right? This is different than the cases cited by the federal government Cumberland Cumberland Island, Norton, even the case about the grants administration manual. The city is not using these to say, there must be compliance with the foundation document. It is that the foundation document is appropriate to consider when looking at how did the government go about its business and making this decision? And that actually the Davis versus you're saying it's not, it's not legally enforceable, like a contract, but it is evidence of arbitrary and capricious administrative action and it sets up what the federal government ought to have considered because it has put an overlay on its own discretion in this space. So, the Davis versus lecture case cited by the federal government that expressly says, yes, the organic act gives a significant grant of discretion to the secretary of the interior. But the secretary can then cabin that that discretion by issuance of his or her own internal policies and guidelines. The foundation document serves as that cabinet of discretion for this site and is thus appropriately examined by a court when looking at whether and how the federal government made its decisions before taking down the panels. Go back to 551. Yes. And you pointed us to 10 D. construction, taking seizure, withholding a property. Correct? Whose property? Your honor that's not defined in the statute. And so with that, I don't know if it could be the federal government's property, or it could be a non federal agencies property, but it's not defined there in in labors of sovereign immunity are construed strictly in favor of the sovereign. Right? That is correct. And so if the word property could mean anyone's property, that's 1 reading, or if it could mean only the property, or it could mean not the federal government taking its own property, there'd be no reason to regulate agency taking its own property. That would be another reading. We would have to pick the 1 that was more favorable to the waiver of sovereign immunity. Right? I think that's correct. Your honor. Okay, can you get back to where you started? I want to hear more about your argument that this was final agency action because it was a sanction. What do you have to support that? I wrote down that you indicated that a sanction was destruction of property. Correct? And are there cases that say that or regulations or statute? Where are you getting that? Your honor, we're getting that just from the plain language of the statute itself. I know there is 1 case out of the circuit out of Texas. But other than that, frankly, I'm not sure this is a litigated provision that much. But when the court instructed, arguably order could apply to this case, but most clearly on the statutory language property does so that that would just be for agency action in terms of finality. There is no record in there. There's no evidence in this record of any further action by the federal government, but nothing again in the record as it stands to suggest this is interlocutory or partway through as the record stands by virtue of the preliminary injunction. That what was put in the record there and then, in terms of the effect on the city, the kind of legal consequences. Obviously, this is not a case, like, a rule making where there might be then the city necessarily changes its business because of a rule. But instead it is the consequence to the city of this not being here is that the city. We'll not be able to the whole point of building the President's house and part of the whole point was for the city to tell its history. And that is what. The federal government recognizes the basis for why the why the city could spend its money to build this that is now gone that gets back to whether this is permanent or not then the tail rights residual rights. Correct. And that's. That's a tough 1, because you donated it. You said that the National Park Service had to manage it. I understand why the city would expect it to remain for a long time or a while at least, but. I'm not sure it makes sense to think the city would expect it to stay for 50 or 100 or 300 years. I mean, things break technology changes. After a certain period of time, those videos would look pretty. If we think about the black and white televisions of our childhood, my child, not your technology changes. So, it stands to reason that those video displays after a period of time would would be in need of replacement at least right? Even if you wanted to keep the content the same, you would want to swap it out for something better. Well, and your honor, I might help me with this. Is this a 1 time permanent thing that could never change? Is that the city's argument or or that it could change, but it had to change in a way that the city endorsed. It could, as we, as we discussed history does change. Videos can break down, but that changes should be consistent with the parks on foundation document and also with, and this gets to the city's broader. But what if we say that foundation document doesn't provide any legal, enforceable rights for you? What's your fallback position? So we're not saying that it is legally enforceable. We're saying that to the extent the park service was going to change it, it would have to consider what it identified as furtherance of the legislative purpose of independence, national park. That's the instructor, but I'm, I'm challenging you on the, on the, the prior foundational question, which is what right? If any, does the city have the city, the city spent millions of dollars city invested in the site. The city was working hand in glove with the federal government during the Bush and Obama administrations to stand up the site. All of that's clear in the record. I don't think we're gonna hear an argument from your friend about that. But I'm asking, what did the city get for its money beyond the erection of the site and the establishment of the initial exhibits did also get that those things could not change for 10, 2050 or ever your honor. It got a sort of yes, and it got an expectation that this site would exist as designed. I think it is also fair to say it got an expectation that changes to this would comport with the 80 years of collaboration that have occurred at this site since it was. Founded so, and so, so, if, if the, if the federal government were to change the, the foundation document to to completely rewrite it, would would the city then have a claim or not? Because it seemed to me that you were saying that so much of the reason that we want to look at the foundation document is to kind of, I think the, the federal government says in its reply brief to set the yardstick. It's the document by which we're going to measure. Were there judicially manageable standards? Was this arbitrary and capricious? But if, what, what if the, what if the federal government were to change that would would so that it didn't include any reference to the paradox of freedom and slavery, you wouldn't have a claim then, right? I don't, I don't think we would have a claim that we would win. Right? Because having a claim is, do we have an interest in the site? Do we have a successful claim? If the foundation document, the yardstick was changed, we might then not have a successful claim. So, your claim really comes down to in 1 level, the standard, it might not create you rights, but it creates the standard on which we're going to evaluate the National Park services action. And that is that there has to be, I guess, I'm rounding out your position. Maybe tell me if I'm wrong. Some, some appreciation of the paradox of freedom and slavery. That is correct. Yes. And on this record, there is none. So, and that is why I see I am well out of time. But that is why, why doesn't the display of the 9 names and the footprints. Make some statement about the paradox of freedom and slavery. Your honor, because without the panels, there's no explanation. Those are things in a void. But, but, yeah, isn't that isn't that the classic kind of curational issue that that your friend was was referencing that there's something about slavery. Their reference, there's 9 names after you do that. Isn't everything else kind of just a curational decision? Something that judges really shouldn't be viewing how well someone displays a exhibit on a National Park. Especially your honor, not in this space, because of the way in which this space was created. That that's not this case here. That may be in another 1, but for here, this president's house was designed and installed with specific context. So, to the extent curation, is there footsteps on the ground and names on a wall without more? No, one knows why those footsteps are there. Why those names are on a wall. And what we have again, this is on the record right now. What we have on the wall. What we have on the record is there is nothing to do that. The government sites, the city's position with respect to the Columbus statute, and it's in its papers. How do you reconcile the city's position in the Columbus statute case for the city's position in this case? Well, frankly, your honor, we lost, which is what we are saying the federal government should do here there. The city said we have a government speech right to do with what we will, and the commonwealth court in that case said, eventually city, you may be able to do that. But you have to go through the correct processes 1st, which, as we're making an arbitrary and capricious review claim, that is much akin to the claims that were made against us. And the irreparable harm to the city, the government's suggestion that there is no irreparable harm. Yes, your honor and are reputable harm stems from my presentation about what this site is, which is where the city tells its specific history and that. The harm comes into play where a, the city no longer does. So, because there's no information up and B, that is particularly acute. This year, when it is the semi quintessential Philadelphia, and it's in the record expects 1.5M visitors to come to Philadelphia. The President's house is at the doorway to the Liberty Bell. That history is not being told to all the people who are expected to come here. The city is not telling its history and that even and I would say the Liberty Bell, which is itself owned by the city in a building built by the federal government. That just again highlights that there is a long history of collaboration in this site and in this space and in this park and that's a right. The city has itself. It's thought of parents. Patriotic. Correct. Correct. This is not a case and there was, I think 1 of the cases was from Massachusetts where a town was doing the Milton. Yeah, because some of the noise from the planes was disturbing. Some of the townspeople. This is the city's history and the city's telling of its history that mayor street is quoted specific or specifically is saying this is our, the city's opportunity to tell the whole complicated truth. And without these panels up, and the only way to tell it is with the original display that was 1st directed. Correct? Your honor. The removal of the panels was wrong and the court should affirm the district court for any, or all of the reasons that we've discussed here today. Thank you very much. Miss Taylor. We'll hear from me. Just call it. Good afternoon on behalf of avenging the ancestors coalition or attack and the black journey as a Mickey. Both are here with us today. I want to start by focusing on the foundation document. This is a case where Supreme Court precedent really controls under both and, you know, be the barrel and DHS be region. Those precedent tell us that when an agency changes its position, it must 1st actually acknowledge that it's changing position. 2nd, give a reason explanation as to why and 3rd consider the reliance interest here appellants failed at each step. 1st, there was clearly a change in position. The foundation document made clear that the paradox of liberty and slavery was actually the significance of the site. Removing all discussions of slavery at the site is clearly a change in position and just to take a step back as counsel has explained the managerial policies are what tell us how an agency can change its position. It's quite detailed under 2.1 and 2.2 and the managerial policies and explaining that the foundation document explain why the site matter tell us why it was created its purpose. Significance and that they can be changed, but the managerial policies tell us how that change can happen. So, the foundation documents are part of the managerial policies. The foundation document is created at every single site that National Park Service has. Or telling the purpose, the foundation document tells the purpose of the site and that's required by the managerial policies is pursuant to the policies. But isn't it the case that the managerial policies don't have any enforceable rights. That's true. Your honor, but also within the Supreme Court precedent that I just cite those are cases in which the Supreme Court has repeatedly recognize that even when you have non binding policies, those non binding policies are the way we determine if there was a change in position so they can be considered. For example, in DHS through Regents, right? It was a non binding policy that had actually changed the country's policy on DACA. But the court found that even though it was non binding, you had to consider the reliance interest. Similar in Encino Motor Car, that deals with a non binding policy. What are the reliance interests here? Because the site was completed, I believe, in 2012. Is that right? It was completed in 2010. So we have 15 years, over 15 years of reliance interest here. But the, the foundation document didn't come about till 2017. That's correct. Your honor. But could you rely in 2010 on something that happened in 2017? The foundation document is adopting what was included in the project development plan that was in the actual agreements, the 2008 agreement. It was an addendum that talks about the paradox of liberty and slavery. It talks about memory as a key value, history lost and found never to be lost again. All of that was included in the agreement and those principles are adopted in the foundation document. And they described that the whole point of the site is to tell the story of the 9 people who were held in slavery by President George Washington. It describes, doesn't that mean the city's rights are stronger under the cooperative agreements and under something that came later? The city's rights, I just want to be clear. There's 2 separate claims that so, for the city's rights with regard to the cooperative agreement that goes to the city reliance on the enabling legislation as well as all of the agreements that were adopted afterwards. Separately, there's an arbitrary and capricious claim that relies on the foundation document as a benchmark for showing us that there was a change in position. And all of the cases that I've just been discussing are cases where there was non binding policy and it was used as a benchmark for seeing there was a change in position. And what's the final agency action here under the APA? It's the removal, the destruction of the site. I think it was put very well that it was an elimination of the site. It wasn't just curation. It was an elimination of all that was required in terms of the discussion of slavery, the paradox, the whole point of the site. I mean, after all, the site is called slavery and freedom and the making of a new nation. That's the name of the site for a reason. If I could turn, what if, what if we disagree with you that it's eliminate? What if we conclude that the retention of the names of the 9 enslaved people at the site and footprints in the walls? What if we conclude that that's something less than elimination? Do you need elimination to prevail in this case? Or can you prevail if it's something less than elimination? Well, first, I would just point to the superintendent declaration, which says that their goal was elimination. It was actually to take down the entire site. That's the record we have. There was no reason given. It was just a statement that they were taking down the entire exhibit, but even sending that you read that to include the walls and the footprints. Well, it says that what was not taken down was not taken down because they did not have the tools to do. So that's what it says in the declaration. But even if there was just a partial removal, I think again, it goes to what's included in the foundation document in terms of the paradox of liberty and slavery being able to tell that story. The 9 people held in slavery. And again, when we think about the reliance interest, if I could turn briefly to that, there are organizations, there are people, there are tourists visiting this site who have relied on it to tell this information. It isn't told anywhere else. This is the first federal site that memorialized enslaved people. That was a hard one social and political inclusion for people who are descendants of enslaved people in this country. There's no other federal site at the time that recognized that experience. What about President Johnson's home? Well, to be clear, at this time, there was no memorial that recognized enslaved people in this way. This was the first memorial and the National Park Service recognized it as such. President Andrew Johnson's home, I think, has a slavery exhibit in it, doesn't it? In Tennessee? I think what National Park Service has recognized is that there was at the time no memorial. This was the first time that there was a memorial that was created through community collaboration. But even if there are, just to be clear, even now at this point, there are other exhibits recognizing the experiences of enslaved people. This is a critical one. There's no, if I can talk about the reliance interest, considering, for example, the Black Journey, which gives place-based tours about Black history. Without this site, to be clear, they start three of their tours at this site, because it is so critical to being able to tell the experience of Black history and the truth about the founding era. You can't really tell it without the site, because this is the one place where President George Washington lived and held people in slavery and actually had slave quarters added to the executive mansion. You can't tell that story in the current status of the site? No, Your Honor. So the building, the walls, the footprints, the names on the wall, a good park ranger or tour guide couldn't tell the story of Hercules or Onajudge or Paris or the other slaves that lived there. They couldn't tell the story of how President Washington moved them in and out of the state to avoid, that story can't be told?  that sounds like, if that's true, that sounds like you're saying what this site is really all about were just the videos and the panels that were up, not all the things I just mentioned. Well, the site wasn't created intentionally to tell a holistic story and that's why each of the pieces were designed through a deliberative process that involves community input. And to be clear again, to go back to the managerial policies, they require that public input. They require historians serving as experts to provide documented evidence. All of that was included in creating the site. What we have left now is a very fragmented story. When you're there, you can't quite put together what it's supposed to mean, because the pieces of the exhibit are missing. Let me just get in and test you with a little bit of a hypothetical, and it's not from this country, but it involves the Roman Coliseum. Assume that someone wanted to tell the story of Christian persecution in the Roman Coliseum. But all that they were allowed access to was the physical structure of the Coliseum. There was no videos. There was no names on the wall. There was no displays. All that they could have would be the physical structure. That would still allow quite a conversation about Christian persecution, wouldn't it? It's possible, but not everybody who visits the site has access to that information. The purpose of the exhibit was to create access to this information that had been kept from the public for many years. And once it was discovered, there was advocacy to ensure the public demanded access to this information that has now been removed. If I could, just on the piece about telling the story someplace else, Your Honor, I think that that argument really misunderstands. I didn't mean to just tell it somewhere else. I meant to tell it right there. Walk, you know, walk through there, you know, one of the benefits of the site. I think many of us in the room have been through it multitude of times. One of the benefits is you can stand right in it, right? Exactly. I think that's public space, right? Yes. The tour guides can go in there and stand there with school groups or other groups, tourists and explain to them what it's all about, right? That's true, Your Honor. But what the exhibit does is provide access to the full documented history. It tells you, what am I looking at? If you're just standing there looking at an archeological dig, the average person doesn't know what that is. It takes the actual exhibit panels to explain to you. This is fundamental as the National Park Service said itself to the site, because this is where we discovered the slave quarters. It gives you piece by piece information to understand and interpret what you're seeing. And that's the value of National Park Service sites. To be clear, all of the National Park Service sites across our country are special. Because when you come there, you can actually encounter the history and the job of the National Park Service, the mission of the Park Service is to provide interpretation to help us understand why it matters. So saying, just to be clear, because council appellants make this argument, it's not the case that you can just learn this information in the same way somewhere else. Because that's like saying that, well, why can't you just learn about the Gettysburg address somewhere other than Gettysburg? There's something special about being where it occurred and encountering that information. And our classrooms, our National Classrooms, as the National Park Service sites are called, give us a service by providing the interpretation that wouldn't exist. Then go back to your reliance argument. Reliance by who? Reliance by the public here. And so I'm speaking about Ameka as examples, right? As we think about Avenging the Ancestors Coalition, they rely on the site for public education. They rely on the site for organizing. They visit the site repeatedly and have done so for 15 years, including on key holidays for freedom and liberty, like the 4th of July. So, right now, for example, just last week, they went to the site for Honor Judge Day. The materials that explain the significance of Honor Judge are missing. That's their reliance interest. And we think about the Black Journey. This is a case where an entire business, many businesses have been built in reliance on this site. Black Journey has had to redesign its tours. It's had to retrain its tour guides again, because they've relied on the materials that are at the site. So, you know, your notion of the duty to consider reliance interest traces to two, I think, relatively recent Supreme Court cases in Sedo Motorcars and DHS v. Regence. And so the answer is, well, do you have to do that? But I don't recall an executive order being present in those cases. Maybe there was in Regence, but I think that was all just what the DHS Acting Secretary was up to. But this case, we have an executive order. And I don't think anyone here is challenging the executive order. So it seems to me that this case is different than those cases, because that was when the agency acts kind of on its own initiative, not pursuant to an executive order. What do you think, what do you make of the presence of the executive order in this case that I don't think was present, I know wasn't present in Encino, and I don't think was present in Regence? Sure, Your Honor, and if I could just actually add one other Supreme Court case that stands for this proposition, which is FDA v. Wages and White Line Law. All of those are interpreting non-binding precedent or policy documents in this way. But with regard to the executive order, I want to be clear under the arbitrary and capricious analysis, no court has ever said that an executive order can be the reason on its own. There has to be some other reason, explanation that the agency gives. But the three, I mean, at one level, maybe they haven't, but they didn't have an executive order present in those cases, right? It's true they did not have an executive order present, but they had other policies that they were supposed to rely on. But in Regence, the acting secretary, her name was Kristen Nielsen, she wasn't acting pursuant to an executive order in that case. She didn't say, I've changed the DACA rules from three years to two years, or I forget the details of that, because I have an executive order that told me so. She just said, I'm going to do it. And isn't this case different because it doesn't have the kind of same, you know, genesis of agency, we're going to do this. It comes through implementation of an executive order. And when that happens, doesn't that change the arbitrary and capricious analysis? Well, to be clear, I mean, I think if we stick with DACA, I mean, it was certainly the case that the executive branch was committed to the policy prior to the memo being released. But I don't think it changes the analysis to be clear that it was based on an executive order, because ultimately what we're talking about is an arbitrary and capricious analysis where there was a change in position. And it's never been the case that you can establish that an agency's action wasn't arbitrary and capricious based on an executive order alone. There has to be some other reason to explanation from the agency. So, following an executive order is not good enough explanation for an agency's change of position because presidents usually when they get into the office, you know, there's usually a signing ceremony, they sign like, 10 or 20 new executive orders. And at that point in time, after the president signs those, you're saying that principles of administrative agency, then put it on the agencies to then go contemplate whether or not they're going to follow those changed executive orders. And if they don't do that, then that's an APA violation. Yes, Your Honor, I think that's black letter APA administrative law that the agency actually has to give its own reason. And that's just relying on the executive order on its own is not sufficient reason. No, no court has ever found that. Do you have a site for that proposition of black letter APA law? Sure. I think is a site for that because that's an example of, you know, there, they say that you have to give more reason. It's not just it can't be reliant just on the executive order. It has to be a reason from the agency itself. Which case was that? Chenery. Yes, but neither of the Chenery cases involved executive orders. Did they know, but they're standing for the preposition that the agency itself has to give the reason. And so I just want to make sure I'm not missing anything. There's no case for the black letter proposition that when an agency follows an executive order, it then has to do its separate own analysis for for why it's doing. So there's no case that we could just say, oh, that's the Smith case, or the Jones case, or the SEC case, or whatever there are cases. I'm sorry, and I can pull cases to site for that because it's well established under Supreme Court precedent that you can't just rely on the executive order alone. You have to actually give a reason that a reason analysis by the agency. And we'd be happy to provide more case law on that. That would be helpful. And I do think Chenery is relevant because I do think that there was discussion within that case. I need to look back at it. But I do think there was discussion in that case about why it is that you have to actually have agency reasoned analysis and not just rely on what the executive branch has said without the agency providing an analysis. If I may, your honor, I wanted to make sure to also address the point about the location as well, because I think this is critical. It's not just that the information, the access to information at the president's house itself is lost. Part of what National Park Service recognized, and this is to quote from the chief historian at the time, it's the juxtaposition that is an interpretive gift in terms of understanding the paradox. The fact that the Liberty Bell is sitting upon where the door to the Liberty Bell is right where the slave quarters of the executive mansion were, and immediately across from Independence Hall, where it was declared that all men are created equal. That collectively is what is significant and brings value in the president's house exhibit was part of telling that story of the paradox, but it is the entire park and the juxtaposition together that matters. And then finally, I just want to point out appellate suggest that these changes are minor. But again, this is the fundamental purpose. It was recognized that page eleven of the foundation document that the reason for the exhibit was the archeological dig that discovered this history. Just one other point on section five, five, one, ten D. if I may, I wanted to point out that Texas, the United States Department of Homeland security, the fifth circuit case that interprets the destruction of property. And that case, it was actually about private land. And so I just wanted to bring that up in response to the question about, is there any case law talking about whether the land has to be federal land that that case involved. Cutting and removal of wire that was installed on private land and the court interpreted as destruction of property. Finally, I want to just touch on the balance of equity and public interest, which overwhelmingly support the injunction each person who visits the park and does not learn the realities of the founding era receives a false account of history. This is a critical time for our country and in Philadelphia for people to come and be able to reflect and learn about the founding era and preserving public trust and documented history at this critical time far outweighs unlawful action. That has been taken without providing any reason. Just imagine if the government removed the Lincoln Memorial right before the bicentennial. That's the type of dangerous precedent that we must avoid here. So, for those reasons, and those provided by a Pelley, this court should affirm the district court preliminary injunction and I'm happy to take other questions. Thank you very much. Appreciate your participation is McClellan. We'll hear rebuttal from Mr. Thank you, your honors, I'd like to start with the notion of the agency action being a sanction here. I agree that that explicit statutory definition is the closest type of enumerated defined agency action that may apply here, but the actual language and 5, 5, 1, subsection 10 D is the destruction, taking seizure or withholding of property, as described in the statute, and I'm happy to answer any questions that you may have on that. Such tips pointed out the most natural reading of that and the case that my friend and the other for me, he just described is that it applies to the property of another withholding, destroying or seizing property. The government already owns cannot reasonably be described as sanctioning anyone. What if the, if the other side has an interest in that property, and we're back to the very interest question we started with, which is, I heard my friend either side say residual property. Right. I think the language, your honor cited at J to five, four. I think my friend on the other side misspoke when she said that applies to the transference of intellectual property rights. That's the actual first operative provision in the agreement itself reads upon completion of the exhibit in accordance with this agreement, ownership of the exhibit shall transfer to the National Park Service and PS ownership of the exhibit shall survive. Any termination of this agreement, staying with that for a second. The fact that they can see this is an act of interpretation is also failed to their claim because there are numerous other provisions that provide responsibility for interpreting the site and the exhibit exclusively in the hands of the National Park Service. This is Jay three or nine. The project will be owned, maintain, manage, and interpreted by the following completion of the project and acceptance by the by J two five five and PS agrees that shall undertake all responsibility to manage, occupy, utilize, operate, repair, maintain, interpret and administer the exhibit. This was an active interpretation. It therefore falls in the agreement. They have disclaimed any residual property, right? At the same time, returning to the sanction piece, there also wasn't any destruction and taking or withholding or seizure of property here. It was already property that the government had. It took down its own property. It's not destroy it. It's not destroy the site. And what do you make when we look at context of five fifty one ten D. it also says taking usually the government never the taking clauses taking someone else's property. Usually when we say taking the government isn't in the business of taking its own property. That's not what the fifth. That's not the taking that the 5th amendment protected against. So, if we want to read 10 D consists so the property would mean the same thing throughout doesn't that support maybe I'm making a point for you. But doesn't that support the proposition that has to be property that's non federally owned exactly? I think that's exactly right. I think the most natural way to read that clause is to apply the property of the non federal entity. And as your honor pointed out, the rule towards strictly construing statutes governing with sovereign immunity likewise in that direction. So, it's your argument that because this isn't the sanction, then there was no agency action at all. Nevermind final agency action. Exactly. I think my friend the other side, which you sit up here, the only type of agency action she described, and the first time we've heard any specific enumeration of what type of agency action they are challenging the only type they gave was a sanction under five, five, one, ten. D. this is not a sanction. Therefore, there is no agency action. Therefore, their claims fail as a matter of law. What if we say it is a sanction? Was it final? I think the fact that we're talking about sanction was agency action. Was it finally agency action? I think under Bennett, your honor looks to whether they are of an interlocutory temporal nature, or whether legal consequences flowed from the action. I think the fact that we're talking so much about an incomplete record, and these potential new signs, and they're not being up strongly indicates that this was an interim step toward updating the signs rather than final agency action. Can we consider that on this record? Ms. Taylor argues that extra record, we can't consider that on this record. I think the court can take the judicial notice of public sources, including those governmental sites. Now, I don't think the court needs to for purposes of answering that question, because I think nearly looking at the agency action in this case, the fact that they took the signs down, and the fact that there was an agency declaration that contemplated further action was to be taken. How do we know that? So, the superintendent's declaration and 2 points on that in particular 1st, and he counsels that at the footprints, and this is the declaration that was filed in the district court. Correct? This is the original declaration specifically J. A. 5, 9, not the supplemental declaration. There was a point made earlier about how that actually said that further removal of the handprints and the names was contemplated. This is paragraph for the 2nd sentence. However, the footprints in the concrete and the names on the memorial wall or to remain as is. It's true that this declaration contemplated further action, which is paragraphs 7 and 8 there. It talks about how there was another 1 sign and a structure and there were additional steps necessary to address that panel. But by very language in this declaration, it says additional action is contemplated. I also think the pictures of the barren exhibit. I think it's a common sense inference that those weren't intended to be less there. There was always, especially after the investment that both the park service and the city made in the site. There was always further action planned for the site. And I think it's a common sense inference. The court can make on this record. Separately, I want to talk about the foundation document. I would direct the court to page 19 on a reply brief. In the hierarchy of material, the foundation documents, it's underneath the management policies is issued pursuant to the management. How do we know that? Ms. Taylor said that it was. Decided not under in addition to it, not subject to it. I think if you read the management policies, it explains that it is the operative sort of top level internal guidance and planning and management document that issues and any other materials are issued pursuant to its authority. But the management policies expressly disclaim enforceable effects and I also want to know that that puts the rabbit in the hat that presupposes that the management policies presuppose the foundation. Document and I'm not sure he persuaded us with that yet. How do we know that? I think if you, I'd be happy to follow up with some local sites, but I think based on recollection, I will follow up happily. Like I said, that the foundation document actually attributes its own terms to the management policies. On top of that, the way I think about this, the foundation document is park and site specific. The management policies are broadly applicable. They govern MPS conduct and internal planning, not conduct, internal planning site wide, not site specifically, meaning it by necessity sits at a sort of superior level because foundation documents are site specific. Given that the management policies, this claim enforceable effect foundation documents issued pursuant to the management policies also this claim enforceable effect. And I would add to that, and this is a different theory than what the city's claim actually was in the district court. If I could direct the court to J. eight, seven, six, five to six, seven there, they actually argued there were barriers to the park service changing the foundation document. I see that I'm nearly out of time. If I meet briefly continue given that that was the theory before this notion that we could just unilaterally change the foundation document and then everything would be okay here doesn't withstand what they argued before. And I also don't think that the city would agree with that. If that's the approach that the park service took as far as, you know, and the other cases that were discussed earlier, each of those cases, barring white line, which I'm not entirely familiar with involved reliance interest and interpretation of binding actual interpretation of what the law was going to be according to the agency. And I've seen a motor cars, although it was in a letter, it was the interpretation of salesperson under the how the agency was actually going to apply that interpretation going forward in official adjudications. I think that entirely distinguishes those cases from this, because under the APA relief includes and this is five, five, one, eleven. See. Sorry, the recognition of a claim right immunity privilege exemption or exception to the extent an agency sets for a interpretation of law in which it in the actual interpretation gives an intent to be bound. This is an official interpretation going for that. We will apply a binding fashion. It makes sense to actually treat that as final agency action and binding and hold the agency to its word. That is not what this case involved. So, all those cases are distinguishable. If the city is correct, and the city retains a residual interest in this exhibit. Based on the two thousand, six cooperative agreement, and the three amendments that followed. Do you lose the case to the extent that that's what that's how their right is found and what is predicated on? Yes. I mean, I, I understand. I understand your argument is that once the site was constructed. And the exhibits and everything there were donated to the N. P. S. and the N. P. S. retain the rights to interpret, manage, maintain, et cetera. It's your argument that the city's rights ended when that happened. Correct? There are residual rights in there, none that actually bar or apply or this action or apply in this case as far as if the court were to find that there may be some residual. I will tell us what tell us what rights residual rights remain that you concede. I think the maintenance obligation is a is a fair one. I think by its terms, the fact that the park service undertook the responsibility to over time, manage, maintain the site. If it let's fall entirely into dereliction. I think that would be a potentially enforce. If if if a bus careened off a market street and knocked everything down precisely, or these agreements require the National Park Service to rebuild it. I think they require it to require them to manage it and maintain it. Not in that situation. Leave it entirely. Not operative, non functional, but maintain doesn't in your world. You doesn't mean preserving the status quo with respect to what and how things are displayed. I think that's an atypical interpretation of what maintain means. It's not an ordinary interpretation. I also don't think it's consistent with exclusive property ownership. If you're actually giving a party and enduring right to actually direct you what to do with the property. I think that's different from maintenance. Now, as far as if we lose, whether there is some sort of enduring. Uh, right based on the agreement. No, this that claim still belongs in the court of federal claims to the fact to the extent that the claim is based on the cooperative agreement. It's a contractual claim. Now, I've heard by the other side argue that this is a different type of agreement. There was consideration. There was offer. There was acceptance. There was clearly an exchange of mutual value. And the terms of the contract, therefore, are either plain terms, a contract that's all that the Tucker requires. That's all that it governs. Therefore, any attempt to enforce the contract belongs in the court of federal and all the city bought in the contract was the erection of the site. Not it's continuous. I think 2 days after the site went up and the exhibits went up, the could have said, sorry, we're going in a different direction and we're, we're changing everything. I think that's entirely accurate. And to the extent of the city says, well, we had an enduring expectation in a long. But I suppose it's your argument that if they really wanted to be legal and legally enforceable, they should have put it in. Right? I think that's exactly right. I think the fact that we have a disharmony here between the press agreements and the actual contractors telling, I think, to the extent of the city wanted that it should have bargained for it. I also think if that enduring right had been bargained for, there would have been a very different exchange and consideration for the federal government to provide a municipality with an enduring, never ending veto right over federal property. I think that would require a lot more than funding of an exhibit. Are there any instances of that being done anywhere else with National Park Service sites? None that I know of your honor. Finally, I want to end on the notion that omission of the signs renders every visitors account false omission of particular facts is not stating any false. It's also not denying any facts. This history is available people can view it. People can research it and there's nothing stopping both as well as the city from telling its own history. The district court made the same mistake. It conflated. Curatorial decisions with erasure and denial. There was no denial here. There was no assertion or statement by the federal government that these facts were false never happened anything like that. It was a curatorial decision. They wanted to change and update the signage with the signs that are currently listed on the website. That is not the same thing as falsifying historical facts or denying that they occur. For all these reasons, this court should vacate with instructions to dismiss for lack of jurisdiction. Thank you. Thank you. Mr. Burkin. Thank you. Miss Taylor. Thank you. As we call it court appreciates the briefing in the oral arguments. We'll take the matter under advice.